# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 25, 2018          Decided July 6, 2018

No. 16-1302

JOHN A. TAYLOR,
PETITIONER

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

---

On Petition for Review of an Order
of the Federal Aviation Administration

---

*John A. Taylor*, *pro se*, argued the cause and filed the briefs for petitioner.

*Abby C. Wright*, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief were *Michael S. Raab*, Attorney, and *Paul M. Geier*, Assistant General Counsel for Litigation and Enforcement, Federal Aviation Administration.

Before: GARLAND, *Chief Judge*, and SENTELLE and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: The Federal Aviation Administration (FAA) has issued a rule that regulates certain unmanned aircraft, popularly known as "drones." Petitioner John Taylor, a model aircraft hobbyist, seeks review of that rule. He contends that the rule exceeds the agency's statutory authority, is arbitrary and capricious, and has miscellaneous additional infirmities. For the following reasons, we deny the petition for review.

I

In the FAA Modernization and Reform Act of 2012, Congress tasked the Secretary of Transportation with developing "a comprehensive plan to safely accelerate the integration of civil unmanned aircraft systems into the national airspace system." Pub. L. 112-95, § 332(a)(1), 126 Stat. 11, 73 (codified at 49 U.S.C. § 40101 note) (hereinafter "Modernization Act"). The Act defines an "unmanned aircraft" as "an aircraft that is operated without the possibility of direct human intervention from within or on the aircraft." Modernization Act § 331(8). A "small unmanned aircraft" is a craft that meets this definition and weighs less than 55 pounds. *Id.* § 331(6). And an "unmanned aircraft system" is "an unmanned aircraft and associated elements," such as communication links and components that control the unmanned aircraft. *Id.* § 331(9).

Section 332 of the Modernization Act instructs the Secretary to conduct a rulemaking "to implement the recommendations" of the comprehensive plan, and to issue "a final rule on small unmanned aircraft systems that will allow for civil operation of such systems in the national airspace system." *Id.* § 332(b). Section 333 of the Act, entitled "Special Rules for Certain Unmanned Aircraft Systems," directs the Secretary to determine whether some unmanned aircraft systems may operate safely in the national airspace system before completion of the

comprehensive plan and rulemaking required by section 332. *Id.* § 333(a).

Section 333 is one of two sections of the Modernization Act that are most directly relevant to this petition. It directs the Secretary to determine "(1) which types of unmanned aircraft systems, if any, as a result of their size, weight, speed, operational capability, proximity to airports and populated areas, and operation within visual line of sight do not create a hazard to users of the national airspace system or the public or pose a threat to national security; and (2) whether a certificate of waiver, certificate of authorization, or airworthiness certification under [49 U.S.C. § 44704] is required for the operation of [such] unmanned aircraft systems." *Id.* § 333(b). If the Secretary determines "that certain unmanned aircraft systems may operate safely in the national airspace system, the Secretary shall establish requirements for the safe operation of such aircraft systems in the national airspace system." *Id.* § 333(c).

The other directly relevant section is section 336, which creates a statutory "Special Rule for Model Aircraft." *Id.* § 336. The section defines a "model aircraft" as "an unmanned aircraft that is -- (1) capable of sustained flight in the atmosphere; (2) flown within visual line of sight of the person operating the aircraft; and (3) flown for hobby or recreational purposes." *Id.* § 336(c). Section 336 provides that, notwithstanding any other provision of law regarding incorporation of unmanned aircraft systems into FAA plans and policies, the FAA (a component of the Department of Transportation) "may not promulgate any rule or regulation regarding a model aircraft" that satisfies the following five operational criteria:

> (1) the aircraft is flown strictly for hobby or recreational use;

(2) the aircraft is operated in accordance with a community-based set of safety guidelines and within the programming of a nationwide community-based organization;

(3) the aircraft is limited to not more than 55 pounds . . . ;

(4) the aircraft is operated in a manner that does not interfere with and gives way to any manned aircraft; and

(5) when flown within 5 miles of an airport, the operator of the aircraft provides the airport operator and the airport air traffic control tower . . . with prior notice of the operation . . . .

*Id.* § 336(a).

Section 336 also provides, however, that nothing in it "shall be construed to limit the authority of the [FAA] Administrator to pursue enforcement action against persons operating model aircraft who endanger the safety of the national airspace system." *Id.* § 336(b). In short, section 336's statutory Special Rule creates a safe harbor from FAA regulation for those model aircraft that meet its five operational criteria. That safe harbor itself has an exception for dangerous model aircraft operations.

For the purposes of this opinion, we will use the phrase "section 336 model aircraft" to refer to model aircraft that meet the five operational criteria of the statutory Special Rule. We will use the term "non-section 336 model aircraft" to refer to model aircraft that do not meet one or more of the safe harbor requirements.

After Congress passed the Modernization Act, the FAA took two related regulatory actions that are relevant as background but are *not* the subject of this case.

In 2014, the agency issued an Interpretation of the Special Rule for Model Aircraft, which interpreted several terms contained in the statutory Special Rule. 79 Fed. Reg. 36,172 (June 25, 2014). The FAA sought public comments on the Interpretation and is currently reviewing those comments. Status Report, *UAS Am. Fund, LLC v. FAA*, No. 14-1156 (D.C. Cir. June 19, 2018).

In 2015, the FAA promulgated a rule requiring the registration of small unmanned aircraft, including model aircraft. Registration and Marking Requirements for Small Unmanned Aircraft, 80 Fed. Reg. 78,594 (Dec. 16, 2015). Taylor challenged the registration rule, and this circuit held that it violated the Modernization Act in certain respects. *Taylor v. Huerta*, 856 F.3d 1089, 1093 (D.C. Cir. 2017). Soon thereafter, Congress restored the registration rule to effect. National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, § 1092(d), 131 Stat. 1283, 1611 (2017).

Finally, in 2016, the agency promulgated the rule that *is* the subject of this case, Operation and Certification of Small Unmanned Aircraft Systems, 81 Fed. Reg. 42,064 (June 28, 2016) (hereinafter "Small UAS Rule"). Two provisions of the Small UAS Rule are at the heart of Taylor's petition for review.

First, the rule adds a new part 107 to the Code of Federal Regulations (C.F.R.) to "allow for routine civil operation" of small unmanned aircraft systems and "to provide safety rules for those operations." *Id.* at 42,066. Consistent with the statutory definition noted above, the rule defines a small unmanned aircraft as one that weighs less than 55 pounds. *Id.* at 42,085-

86; *see* 14 C.F.R. § 107.3. To mitigate risk, the rule limits small unmanned aircraft systems to "daylight and civil twilight operations with appropriate collision lighting, confined areas of operation, and visual-line-of-sight operations." 81 Fed. Reg. at 42,066; *see* 14 C.F.R. §§ 107.29, 107.31, 107.43, 107.45. Part 107 also addresses "airspace restrictions, remote pilot certification, visual observer requirements, and operational limits." 81 Fed. Reg. at 42,066; *see, e.g.*, 14 C.F.R. §§ 107.33, 107.37, 107.41, 107.61.

Second, the Small UAS Rule adds a new subpart E to part 101 of the C.F.R., as well as a § 107.1 to part 107. Those provisions codify the statutory Special Rule for Model Aircraft contained in Modernization Act § 336. Subpart E's § 101.41 lists the five operational criteria required to qualify for the statutory safe harbor from FAA regulation. 14 C.F.R. § 101.41. Subpart E's § 101.43 provides that the safe harbor does not extend to operations that endanger the safety of the national airspace system. *Id.* § 101.43. And § 107.1 completes the package by providing that the small unmanned aircraft system requirements of part 107 do not apply to any aircraft that falls within the safe harbor of § 101.41. *Id*. § 107.1(b)(2).[1] The result is that a section 336 model aircraft -- one that meets the five criteria in the statutory Special Rule -- is exempt from the new part 107 requirements. By contrast, a model aircraft that fails to meet one or more of the section 336 criteria is subject to the regulations of part 107.

---

[1] Section 107.1 accomplishes this by providing that part 107 "does not apply to . . . [a]ny aircraft subject to the provisions of part 101." *Id.* § 107.1(b)(2). And § 101.1 states that part 101 "prescribes rules governing the operation" of "[a]ny model aircraft that meets the conditions specified in § 101.41." *Id.* § 101.1(a)(5).

## II

Taylor has petitioned for review of the Small UAS Rule. His challenges fall into four categories, which we address below.

## A

Taylor contends that the rule violates the Modernization Act by regulating the forbidden category of section 336 model aircraft. As we noted above, section 336(a) of the Act states that the FAA "may not promulgate any rule or regulation regarding a model aircraft" if that aircraft meets the five operational criteria listed in the statute. Modernization Act § 336(a). Taylor argues that the rule violates section 336(a) in two respects: by imposing new regulations on section 336 model aircraft, and by exposing section 336 model aircraft to pre-existing regulations. The FAA did not request *Chevron* deference for its statutory interpretation, *see Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Because we conclude that the petition should be denied on de novo review, we do not address the *Chevron* standard. *See Fed. Election Comm'n v. Craig for U.S. Senate*, 816 F.3d 829, 839 n.6 (D.C. Cir. 2016).

Taylor's first argument is that the newly promulgated 14 C.F.R. § 101.41 is a rule or regulation regarding model aircraft and is inconsistent with section 336(a). Taylor's argument fails because § 101.41 does not *regulate* section 336 model aircraft at all. To the contrary, it simply *defines* the model aircraft that fall within section 336(a) and, in so doing, does no more than repeat the five criteria that Congress itself listed in section 336(a).

Section 101.41 states:

> This subpart prescribes rules governing the operation of a model aircraft . . . that meets all of the following conditions *as set forth in section 336* of Public Law 112–95:
>
> (a) The aircraft is flown strictly for hobby or recreational use;
>
> (b) The aircraft is operated in accordance with a community-based set of safety guidelines and within the programming of a nationwide community-based organization;
>
> (c) The aircraft is limited to not more than 55 pounds . . . ;
>
> (d) The aircraft is operated in a manner that does not interfere with and gives way to any manned aircraft; and
>
> (e) When flown within 5 miles of an airport, the operator of the aircraft provides the airport operator and the airport air traffic control tower . . . with prior notice of the operation.

14 C.F.R. § 101.41 (emphasis added); *compare* Modernization Act § 336(a). Section 101.43 then subjects model aircraft that meet those criteria to only one requirement: the anti-endangerment provision expressly permitted by Modernization Act § 336. 14 C.F.R. § 101.43; *see* Modernization Act § 336(b). And the new § 107.1(b)(2) then *exempts* model aircraft that satisfy the § 101.41 criteria from the regulations imposed by the new part 107. 14 C.F.R. § 107.1(b)(2).

Accordingly, the Small UAS Rule's § 101.41 is nothing like the Registration Rule that we invalidated in Taylor's previous challenge. *See Huerta*, 856 F.3d at 1092. The Registration Rule "create[d] a new regulatory regime for model aircraft." *Id.* at 1093. It "impose[d] new requirements . . . on people who previously had no obligation to . . . the FAA" and "impose[d] new penalties . . . on model aircraft owners who [did] not comply." *Id.* By contrast, § 101.41 simply mirrors the statutory category of section 336 model aircraft and imposes no requirements on them (except for the anti-endangerment requirement permitted by section 336(b)). *See* Modernization Act § 336(b).[2]

Taylor's second claim is that the Small UAS Rule unlawfully subjects section 336 model aircraft to pre-existing regulations that were previously applicable only to traditional, full-size aircraft. According to Taylor, the rule exposes section 336 model aircraft to the "entire weight of traditional aircraft statutes and regulations," yielding "results that are as legally inescapable as they are absurd." Taylor Br. 24, 25. He claims, for example, that all hobbyists must now obtain pilots' licenses, comply with minimum altitude requirements, and service their aircraft at licensed aircraft mechanics. *Id.* at 25-26, 44-47.

In Taylor's view, this parade of horribles arises because § 107.1(a) states that, "[e]xcept as provided in paragraph (b) of this section, this part applies to . . . civil small unmanned aircraft systems." 14 C.F.R. § 107.1(a). Taylor concludes from this language that section 336 model aircraft are to be treated as a type of "civil small unmanned aircraft system," and thus a type

---

[2] Of course, a rule that defines the category of aircraft that it does *not* regulate could be described as a rule "regarding" such aircraft. But we do not read section 336(a) as barring the FAA from advising operators which aircraft are *not* subject to the Small UAS Rule.

of "aircraft," for all statutory and regulatory purposes. Taylor Br. 24.

This reads too much into the rule's reference to "civil small unmanned aircraft systems." As noted above, none of the new requirements of part 107 apply to section 336 model aircraft at all. That is because the "paragraph (b)" exception referred to in the above quotation states that "[t]his part does not apply to . . . [a]ny aircraft subject to the provisions of part 101," 14 C.F.R. § 107.1(b)(2), and § 101.41 mirrors the section 336(a) criteria, *see id.* § 101.41; *supra* note 1.

Nor does any other part of the Small UAS Rule subject section 336 model aircraft to the pre-existing regulations Taylor identifies. To the contrary, in the rule's preamble, the FAA explained that it had not proposed "any changes to its existing regulations with regard to section 336 operations" and that such changes were beyond the scope of the rulemaking. 81 Fed. Reg. at 42,083. The challenged rule itself, therefore, imposes no restrictions on section 336 model aircraft apart from the anti-endangerment regulation, 14 C.F.R. § 101.43, which Taylor does not challenge.[3] At oral argument, the FAA agreed with this interpretation.[4] Accordingly, because Taylor's petition for

---

[3] Taylor does not challenge the FAA's authority to promulgate the anti-endangerment regulation for good reason. As noted in Part I, the statutory Special Rule contains an exception to the section 336(a) regulatory bar for this type of FAA regulation. *See* Modernization Act § 336(b) ("Nothing in this section shall be construed to limit the authority of the Administrator to pursue enforcement action against persons operating model aircraft who endanger the safety of the national airspace system.").

[4] Oral Arg. Recording at 48:20-48:57 (Court: "Do you regard anything that the agency did in the rulemaking that is challenged here as imposing any regulations on model aircraft that satisfy the statute's

review was limited to the Small UAS Rule, *see* Pet. for Rev., *Taylor v. FAA*, No. 16-1302 (D.C. Cir. Aug. 29, 2016), he will have to file a new petition should he ever wish to challenge an attempt by the FAA to apply a pre-existing rule to section 336 model aircraft.

Because the challenged rule's only regulation of section 336 model aircraft is permitted by the Modernization Act, the FAA has honored the statutory safe harbor for these aircraft. We therefore reject this challenge.

B

Taylor's next contention concerns the FAA's statutory authority to regulate non-section 336 model aircraft. Unlike section 336 model aircraft, these recreational aircraft fall outside the statutory (and regulatory) safe harbor and are subject to the new operating requirements of part 107.[5] Taylor argues that the FAA lacks statutory authority to regulate non-section 336 model aircraft.

According to Taylor, prior to passage of the Modernization Act, "the FAA consistently acknowledged it did not have regulatory authority over recreational model aircraft." Taylor Br. 30. Taylor maintains that, at the time the Modernization Act

336 requirements?" FAA Counsel: "No." Court: "No requirements of any kind?" Counsel: "No. . . . There is a regulation that prohibits reckless operations, but . . . 336(b) expressly permits FAA to prevent reckless operation even of model aircraft.").

[5] Part 107 applies to "civil small unmanned aircraft systems" except, as relevant here, to "[a]ny aircraft subject to the provisions of part 101." 14 C.F.R. § 107.1 (a), (b)(2). Because only those model aircraft that meet all of the section 336(a) criteria are subject to part 101, part 107 governs model aircraft that do not meet those criteria.

was passed, the FAA's interpretation of the pre-existing Federal Aviation Act was that only "commercial use small unmanned vehicles" were aircraft; recreational model aircraft, by contrast, were not "aircraft" at all. *Id.* Moreover, he continues, the Modernization Act "codified" that FAA interpretation. *Id.* The FAA disputes Taylor's claims about its previous interpretation, stating that its previous failure to regulate recreational model aircraft was an exercise of enforcement discretion, not statutory interpretation. *See* Operation and Certification of Small Unmanned Aircraft Systems, 80 Fed. Reg. 9544, 9550 (proposed Feb. 23, 2015); FAA Br. 43-44.

We do not need to resolve the parties' dispute about the FAA's previous interpretation of the pre-existing statutory provisions, or their dispute about whether those provisions alone would have been sufficient to authorize the Small UAS Rule. The primary authority upon which the FAA relies for that rule is a *new* statutory section: section 333 of the Modernization Act, passed in 2012. *See* 81 Fed. Reg. at 42,067 n.6. And there is no doubt that this section permits the agency to apply the regulations of the Small UAS Rule to recreational model aircraft that do not fall within the section 336 safe harbor.

Modernization Act § 333 directs the FAA to determine "which types of unmanned aircraft . . . may operate safely in the national airspace system," and then directs the agency to "establish requirements for the safe operation of such aircraft." Modernization Act § 333(b), (c). Section 336, in turn, defines a "model aircraft" as "an unmanned *aircraft* that is . . . flown *for hobby or recreational purposes*." Modernization Act § 336(c)(3) (emphases added). And it provides that the FAA may not promulgate regulations regarding "a model aircraft . . . *if* . . . the aircraft" satisfies the five operational criteria of the safe harbor. *Id*. § 336(a) (emphasis added). Thus, the text makes clear that Congress has authorized the FAA to regulate

recreational model aircraft, so long as they are outside the safe harbor of section 336(a).[6]

There is nothing to support Taylor's contention that, notwithstanding the above, the Modernization Act was intended to codify the alleged prior understanding that the FAA could not regulate any recreational model aircraft.[7] To begin, we note that Taylor has cited neither statutory language nor legislative history that indicates such an intent. It is true, as Taylor notes, that "Congress is presumed to be aware of an administrative . . . interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). But even if we were to accept Taylor's claim regarding the FAA's interpretation of pre-existing statutory provisions, Congress did not re-enact a statute without change here. To the contrary, it enacted a new statute with

---

[6] The statutory text likewise contradicts Taylor's contention that an aircraft is solely "a tool of manned flight, used, by a person, to achieve that person's flight." Taylor Br. 31 n.16. At least with respect to the Modernization Act, "aircraft" includes "unmanned aircraft." *See* Modernization Act § 331(8).

[7] In *Taylor v. Huerta*, we did say that section 336(a) "codified the FAA's longstanding hands-off approach to the regulation of model aircraft." 856 F.3d at 1091. But that codification extended only to model aircraft falling within the safe harbor of section 336(a). The problem with the Registration Rule at issue in *Huerta* was that it applied to all model aircraft, not just to model aircraft outside the safe harbor. *See id.* at 1092; *see also* Order, *Taylor v. Huerta*, No. 15-1495 (D.C. Cir. Aug. 3, 2017) (denying petitioner's motion for a contempt sanction against the FAA for applying registration requirements to non-section 336 model aircraft).

entirely new provisions regarding the regulation of unmanned aircraft.[8]

Taylor insists that the *structure* of the Modernization Act indicates that Congress "adopted the FAA's [allegedly] consistent interpretation that recreational model aircraft are neither 'civil aircraft' nor 'public aircraft' (the only two types of aircraft that exist)," and that, as such, "they are not aircraft at all." Taylor Br. 35 (citing 49 U.S.C. § 40102(a)(16)). He argues that the structure so indicates because it "create[s] separate regimes for: 1) civil unmanned aircraft, in § 332 and § 333; 2) public unmanned aircraft, in § 334; and 3) recreational model aircraft, in § 336." *Id*. at 34-35. We disagree.

First, the suggestion that recreational model aircraft are neither "public" nor "civil" aircraft, and hence "not aircraft at all," is at best a counterintuitive interpretation of the pre-existing statutory definition.[9] In any event, the contention that a model aircraft is not an "aircraft" for purposes of the Modernization Act is directly contradicted by the Act itself, which, as we have just noted, defines "model aircraft" as "an unmanned aircraft that is . . . flown for hobby or recreational purposes." Modernization Act § 336(c)(3); *see id.* § 331(8) (defining "unmanned aircraft" as a type of "aircraft").

---

[8] Nor did it merely "adopt[] a new law incorporating sections of a prior law." *Lorillard*, 434 U.S. at 581.

[9] Section 40102(a) defines an "aircraft" as "any contrivance . . . designed to navigate, or fly in, the air." 49 U.S.C. § 40102(a)(6). It defines a "public aircraft" as a government aircraft. *Id.* § 40102(a)(41). And it then defines a "civil aircraft" as "an aircraft except a public aircraft." *Id.* § 40102(a)(16).

Second, the Act does not create the three separate regimes that Taylor perceives. Section 332 does apply to "civil unmanned aircraft," and section 334 does apply to "public unmanned aircraft." *Id.* §§ 332, 334. But section 333 (which is the directly relevant section here and directs expedited rulemaking) simply applies to "certain unmanned aircraft" -- those the FAA determines may operate safely in the national airspace system. *Id.* § 333.

Nor does section 336 constitute a statutory bar against any regulation of recreational model aircraft. As set forth above, that section provides that the FAA may not promulgate regulations regarding "a model aircraft . . . *if* . . . the aircraft" satisfies the five operational criteria of the safe harbor. *Id.* § 336(a) (emphasis added). The *expressio unius est exclusio alterius* canon -- "the expression of one thing implies the exclusion of others" -- suggests that the FAA *may* promulgate regulations if an aircraft does *not* satisfy those criteria.[10] And while that canon's "force in particular situations depends entirely on context," *In re Sealed Case No. 97-3112*, 181 F.3d 128, 132 (D.C. Cir. 1999) (en banc) (internal quotation marks omitted), here the context indicates that Congress expected that

---

[10] *Cf. Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (holding that a statutory provision authorizing release from detention in certain circumstances implies that there are no other circumstances under which individuals detained under the provision may be released); *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2238 (2014) ("By taking care to mandate express pre-emption of some state laws, Congress if anything indicated it did not intend the [statute] to preclude requirements arising from other sources."); *In re Sealed Case No. 97-3112*, 181 F.3d 128, 132 (D.C. Cir. 1999) (en banc) (applying the canon to conclude that a Sentencing Guidelines section providing "that *if* the government moves the court may depart [from the Guidelines]," means, in context, "that if the government does not move the court may not depart").

a model aircraft would be subject to regulation if it did not come within the safe harbor. After all, why would Congress go to the trouble of defining (by listing five criteria) a protected subcategory of "model aircraft" if it thought the FAA had no authority to regulate model aircraft at all?

Finally, although we hold that the FAA has authority to apply the part 107 requirements to recreational model aircraft outside the safe harbor (that is, to non-section 336 model aircraft), we do not decide whether the agency may apply any other regulations to these aircraft. We do not read part 107 -- or anything else that the FAA promulgated in the Small UAS Rule that is the sole subject of the petition before us -- to make other regulatory provisions applicable to these recreational model aircraft, except for those provisions expressly cross-referenced in the rule. *See, e.g.*, 14 C.F.R. § 107.27 (requiring compliance with 14 C.F.R. §§ 91.17 and 91.19). At oral argument, the FAA again agreed with this reading.[11] If the FAA were to apply other, pre-existing regulatory provisions to non-section 336 model aircraft, that decision may be subject to a separate challenge.[12]

---

[11] Oral Arg. Recording at 53:46-54:09 (Court: "In your view, the only -- the *only* requirements that apply to unmanned aircraft that don't meet 336 are those contained in 107, [is] that right?" FAA Counsel: "That's right . . . to be clear, it's a subset of operations, so . . . it has to be during the day, you have to have visual line of sight observer, all of those things.").

[12] Because those pre-existing regulations and the statutory provisions upon which they were based (including their definition of "aircraft") are not before us, we do not address Taylor's complaint that, by deferring consideration of how such regulations and provisions apply to recreational unmanned aircraft systems, the FAA rendered those regulations and provisions arbitrary, capricious, or unconstitutionally vague.

C

We turn next to Taylor's contention that the Small UAS Rule is "arbitrary and capricious." Taylor Br. 40 (citing 5 U.S.C. § 706(2)(A)). Under the familiar "arbitrary or capricious" standard for reviewing agency action, the scope of our review is "narrow," and we will not "substitute [our] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action survives such review as long as the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted). Taylor's five arguments do not persuade us that the FAA acted arbitrarily or capriciously in this matter.

1. Taylor first asserts that the Small UAS Rule creates "absurd and contradictory results [by] applying full-size aircraft regulations" to model aircraft. Taylor Br. 41. We reject this challenge because the rule does not do so. As explained above, the Small UAS Rule does not apply *any* regulations to section 336 model aircraft except the anti-endangerment regulation. Nor does the rule apply full-size aircraft regulations to non-section 336 model aircraft. As also explained above, the only regulations the rule applies to such aircraft are those in (and referenced in) the new part 107, which was specifically crafted for small unmanned aircraft.[13]

---

[13] We do not understand Taylor to be charging that the small unmanned aircraft regulations of part 107 are themselves "absurd and contradictory" as applied to non-section 336 model aircraft. In any event, his briefs do not do so with sufficient specificity for us to discern such a charge. The FAA crafted the regulations of part 107 because it recognized that pre-existing regulations did "not differentiate between manned and unmanned aircraft" and hence could

18

2. So far as Taylor challenges the FAA's decision to regulate recreational non-section 336 model aircraft at all, rather than limiting its regulations solely to commercial (non-recreational) craft, the FAA appropriately accounted for that choice. The agency explained that, "from a safety point of view, there is no difference between the risk posed by recreational operations . . . and non-recreational . . . operations." 81 Fed. Reg. at 42,081. In particular, the agency was concerned that an unmanned aircraft operator would not have the ability to see and avoid other aircraft, and that a loss of positive control of the aircraft could pose a risk to persons, property, and other aircraft. *Id.* at 42,068. Because "[t]here is no data indicating that a small UAS operation whose operational parameters raise the safety risks addressed by part 107 would become safer simply as a result of being conducted for recreational or salutary purposes," *id.* at 42,081, the agency's decision to regulate recreational non-section 336 model aircraft was reasonable.

3. Taylor also argues that the agency arbitrarily changed its position regarding the regulation of recreational model aircraft. In Taylor's view, the agency historically treated such aircraft as "toys . . . rather than as a type of 'aircraft'" subject to the FAA's statutory authority. Taylor Br. 11. He contends that the Small UAS "Rule's application of [p]art 107 . . . to recreational [non-section 336] model aircraft" thus marks a "radical change" that the agency cannot lawfully ignore. *Id.* at 43-44; *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").

---

result in an "undue burden" on small unmanned aircraft operations. 81 Fed. Reg. at 42,069. The part 107 provisions were specifically "designed to impose the minimal burden necessary to ensure the safety and security of a small UAS operation." *Id.* at 42,082.

Once again, it is unnecessary for us to wade into the agency's historical practice because the "primary authority" for the rule was a *new* statute, the Modernization Act. 81 Fed. Reg. at 42,067 n.6 (noting that the agency relied primarily on section 333 of the Act, as well as on other FAA statutory authorities). It is true that a new law does not necessarily give an agency a blank check to depart from prior policies. *See Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Brock*, 835 F.2d 912, 917-18 (D.C. Cir. 1987) (rejecting an agency's assertion that its "dramatic shift" in policy reflected a "contemporaneous interpretation of new legislation" where the new legislation "made absolutely no alteration to the statutory mandate" underlying the policy). But as we have discussed, in this case the Modernization Act directed the FAA to establish requirements for the safe operation of unmanned aircraft systems, including recreational model aircraft outside the safe harbor. *See supra* Section II.B. Congress' directive to integrate such aircraft into the national airspace system adequately supports any shift in the FAA's policy toward recreational non-section 336 model aircraft that is reflected in the Small UAS Rule.

4. Taylor further contends that the agency acted arbitrarily and capriciously by imposing a notice requirement on operators of section 336 model aircraft. Specifically, he objects to the requirement that model aircraft operators who want an exemption from part 107 must "provide[] [an] airport operator and the airport air traffic control tower . . . with prior notice of the operation" when flying within five miles of the airport. 14 C.F.R. § 101.41(e). This requirement is arbitrary, he maintains, because the agency does not require similar notice by part 107 operators. Taylor Br. 48 (citing 14 C.F.R. § 107.43).

We reject Taylor's argument because it is the statute, not the regulation, that imposes the notice requirement. *See*

Modernization Act § 336(a)(5). As we have said, Modernization Act § 336(a) lists five operational criteria, including the notice requirement, that model aircraft must satisfy to fall within the statutory safe harbor. Section 101.41 faithfully tracks those requirements, including the notice requirement. *Compare* 14 C.F.R § 101.41(e), *with* Modernization Act § 336(a)(5). And we decline to strike down a rule that merely implements an unchallenged governing statute. *See AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 396 (1999) ("[I]t is hard to declare the FCC's rule unlawful when it tracks the pertinent statutory language almost exactly."); *see also Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1205 (D.C. Cir. 1998); *Metro. Wash. Airports Auth. Prof'l Fire Fighters Ass'n v. United States*, 959 F.2d 297, 300 (D.C. Cir. 1992).

5. Fifth, we reject Taylor's contention that the FAA acted unreasonably by declining to define certain terms in the Small UAS Rule. Taylor maintains that the FAA should have clarified what makes an organization a "nationwide community-based organization," what qualifies as "programming," and what activities "endanger the safety of the national airspace." *See* 14 C.F.R. §§ 101.41(b), 101.43. The first two terms are part of one of the criteria for the safe harbor exemption from part 107, *id.* § 101.41(b); the third is the anti-endangerment provision applicable to section 336 model aircraft, *id.* § 101.43. All three precisely mirror the language of section 336 of the Modernization Act.

In the notice accompanying the Small UAS Rule, the FAA stated that "issues concerning the specific meaning of section 336 (such as what makes an organization a nationwide community-based organization) are beyond the scope of this rule." 81 Fed. Reg. at 42,082. The agency explained that it was "considering the specific meaning of section 336 provisions in a separate regulatory action," and that, "in order to avoid

duplication, [it] limited the scope of the model-aircraft component of th[e] rulemaking simply to codifying the FAA's enforcement authority over model-aircraft operations that endanger the safety" of the national airspace. *Id.*

The "separate regulatory action" to which the agency referred was the proceeding for issuance of an Interpretation of the Special Rule for Model Aircraft. *See* 79 Fed. Reg. 36,172 (June 25, 2014); *supra* Part I. The initial interpretation, issued in 2014, did in fact interpret several terms in section 336, including several of interest to Taylor. *See* 79 Fed. Reg. at 36,174 (identifying Congress' intended definition of "nationwide community-based organization"); *id.* n.7 (explaining that "community-based organizations" include groups such as the Academy of Model Aeronautics); *see also* 81 Fed. Reg. at 42,124 (identifying the Academy of Model Aeronautics as a nationwide community-based organization). The initial interpretation also discussed the scope of the FAA's enforcement authority against operators who endanger the safety of the national airspace system. 79 Fed. Reg. at 36,175-76. As we noted in Part I, the FAA sought public comments on the initial interpretation and is currently reviewing those comments. Petitions for review challenging the initial interpretation, filed in this circuit, have been held in abeyance pending issuance of a final interpretive rule. *See* Order, *UAS Am. Fund, LLC v. FAA*, No. 14-1156 (D.C. Cir. Nov. 18, 2014).

Contrary to Taylor's complaint, it was not unreasonable (or unconstitutional) for the FAA to use the instant rulemaking merely to codify section 336 and to consider the specific meaning of section 336's provisions in the separate regulatory action that it had already begun. "An agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of . . . priorities" and "need not solve every problem before it in the same proceeding." *Mobil Oil*

*Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230-31 (1991).[14] In announcing the Small UAS Rule, the FAA explained that it had "received over 33,000 public comments" on the initial interpretation and was "currently considering the issues raised by these commenters and will issue a final Interpretive Rule that reflects its consideration." 81 Fed. Reg. at 42,082. Delaying issuance of the Small UAS Rule until it finalized the interpretive rule, the FAA said, "would prejudice non-model small UAS operations." *Id.* at 42,083. In light of these considerations -- coupled with the Modernization Act's directive to expedite rulemaking for unmanned aircraft systems where possible, *see* Modernization Act §§ 332(b), 333 -- it was reasonable for the agency to place further definition of those terms in a holding pattern while it landed the Small UAS Rule.

We therefore reject all of Taylor's "arbitrary and capricious" challenges to the rule.

D

Finally, Taylor contends that the FAA violated the Paperwork Reduction Act (PRA), 44 U.S.C. §§ 3501 *et seq*. That Act requires agencies to follow specific procedures prior to "conduct[ing] or sponsor[ing] the collection of information," including publishing notice in the Federal Register and obtaining approval from the Office of Management and Budget (OMB). *Id.* § 3507(a).

---

[14] *See Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1032 (D.C. Cir. 2008); *cf. Charter Commc'ns, Inc. v. FCC*, 460 F.3d 31, 43 (D.C. Cir. 2006) (holding that "[t]he FCC has discretion 'to defer consideration of particular issues to future proceedings when it thinks that doing so would be conducive to the efficient dispatch of business and the ends of justice'" (quoting *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 588 (D.C. Cir. 2004))).

According to Taylor, the agency did not follow the required procedures before mandating that operators of section 336(a) model aircraft provide notice to airports. As we have explained, however, that notification provision is one of the five statutory criteria required of operators who wish to take advantage of the safe harbor provided by section 336(a). *See supra* Part II.C.4. The FAA's regulation merely repeats that criterion, without any elaboration or specification of the form of notice required. Hence, the PRA is inapplicable because it was Congress, not the agency, that made notification a prerequisite for entry into the safe harbor. *Compare Saco River Cellular, Inc. v. FCC*, 133 F.3d 25, 32 (D.C. Cir. 1998) (holding that the FCC was required to comply with the PRA where "Congress merely authorized, [but] did not require" the collection of information).

Taylor also faults the FAA for failing to follow PRA procedures for the B4UFLY smartphone application, an app designed to give unmanned aircraft operators real-time information about flight restrictions and other requirements. Because B4UFLY was not part of the challenged Small UAS Rule, it is beyond the scope of the petition for review that is now before us. We note, however, the FAA's representation that PRA procedures were in fact followed and that OMB approved the collection of information with respect to B4UFLY. FAA Br. 48. We also note Taylor's failure to dispute the point in his reply brief.

III

The FAA has promulgated a rule that regulates section 336 model aircraft only to the extent expressly permitted by Congress. The rule regulates recreational non-section 336 model aircraft more broadly, but that regulation is likewise consistent with Congressional directives. Because the rule is

within the agency's statutory authority and is neither arbitrary nor capricious, the petition for review is

*Denied.*