# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 31, 2022        Decided March 25, 2022

No. 21-1097

JANE DOE,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

Consolidated with 21-1098

———

On Petitions for Review of an Order
of the Securities and Exchange Commission

———

*Max Maccoby* argued the cause and filed the briefs for petitioner.

*Brooke Wagner*, Senior Counsel, Securities and Exchange Commission, argued the cause for respondent. With her on the brief were *Michael A. Conley*, Solicitor, and *Stephen G. Yoder*, Senior Litigation Counsel.

Before: HENDERSON and TATEL, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed Per CURIAM.

Opinion concurring in the judgment filed by *Circuit Judge* HENDERSON.

The petitioners seek review of a Securities and Exchange Commission (SEC or Commission) order denying their applications for whistleblower awards resulting from a successful SEC enforcement action. They contend that the SEC adopted an unreasonably narrow interpretation of its regulation governing the whistleblower program and that their circumstances satisfy the requirements for award eligibility under a proper reading of the regulation. *See* 17 C.F.R. § 240.21F-4(c).

We disagree. The SEC properly denied their award applications under its reasonable and longstanding interpretation of the relevant regulation, which sets forth three scenarios allowing for the issuance of a whistleblower award—none of which encompasses the additional scenario proposed by the petitioners. Their additional arguments are either forfeited or meritless. Accordingly, we deny the petitions.

**I.**

In January 2012, the SEC opened an investigation into alleged violations of the Foreign Corrupt Practices Act of 1977 (FCPA), 15 U.S.C. §§ 78dd-1 *et seq.*, by Novartis AG, a Swiss pharmaceutical company operating in China. The SEC investigation concluded in 2016 when it issued an order settling administrative proceedings against Novartis. It determined that Novartis had violated the books and records and internal accounting controls provisions of the FCPA through its pharmaceutical operations in China. 15 U.S.C. § 78m(b)(2)(A), (B). Specifically, the SEC found that, from 2009 to 2013, employees and agents of two Novartis

subsidiaries operating in China provided things of value, such as gifts, travel, entertainment and favors, to Chinese healthcare providers and officials with the goal of increasing Novartis's pharmaceutical sales in the country. The employees and agents then attempted to conceal the nature of these transactions by using complicit third parties and improperly recording the transactions in the books and records of its subsidiaries.

In the order settling the administrative proceedings with Novartis, the SEC noted that "Novartis instituted an expansive review of its relationships in China with travel and event planning vendors" and subsequently took remedial steps "[i]n connection with the SEC Staff's investigation and in response to media reports concerning a competitor." Joint Appendix (J.A.) 5–6. The Commission imposed approximately $25 million in sanctions, ordering Novartis to pay disgorgement of $21,579,217, prejudgment interest of $1,470,887 and a civil penalty of $2,000,000, all of which has been collected in full.

Following the successful enforcement action, the SEC Office of the Whistleblower published a Notice of Covered Action regarding the Novartis proceeding and twelve individuals, including the two petitioners here, filed applications for an award. The SEC's Claims Review Staff (CRS) reviewed the award claims and determined that only two of the twelve applicants, identified as Claimant 1 and Claimant 2, merited an award because the SEC had opened the investigation based on information provided by those two claimants—not based on information provided by any of the remaining ten. The SEC ordered that Claimant 1 and Claimant 2 receive a joint award. This award has not been challenged.

The petition here involves the award claims of Claimant 11 and Claimant 12.[1] Each worked for a competitor of Novartis in China; each had informed the SEC of illegal behavior by her employer; and each had subsequently informed American media about that behavior. Media outlets then ran stories about these allegations. Each claimant argued she was entitled to a whistleblower award because, in each claimant's view, the media reports had caused Novartis to review its practices and ultimately settle with the SEC.

The CRS issued a preliminary denial of their claims because the information they provided did not "[lead] to" the successful enforcement action against Novartis as defined in Exchange Act Rule 21F-4(c). *See* 17 C.F.R. § 240.21F-4(c)(1)–(3). The petitioners provided information related to alleged misconduct by two of Novartis's competitors, not Novartis. Accordingly, the CRS concluded that their information did not cause the opening or reopening of the investigation as required by Rule 21F-4(c)(1). *See id.* § 240.21F-4(c)(1). They failed to meet the requirements of Rule 21F-4(c)(2) because the information they provided did not relate to conduct already under investigation or examination and did not significantly contribute to the success of the action. *See id.* § 240.21F-4(c)(2). The CRS reached this conclusion because the reported information involved conduct by different companies and was not used in the Commission's investigation. Further, the CRS reasoned that the connection between Claimant 11's and Claimant 12's submissions of this information to the news media—and its subsequent appearance in various news articles—and the charges in the Novartis action was "tenuous at best," far from demonstrating a significant

---

[1] The CRS also recommended the denial of award claims by Claimants 3, 4, 5, 6, 7, 8, 9 and 10. These claimants did not contest the preliminary denial and the SEC accordingly did not evaluate their claims in its final order.

contribution to the success of the action. Erasing any lingering doubt, the CRS emphasized that "the submissions made by Claimants 11 and 12 to the Commission had no impact whatsoever on the Covered Action." Finally, the petitioners did not merit an award under Rule 21F-4(c)(3) because, although their submitted information purportedly sparked an internal investigation at Novartis, the findings of which became part of the Covered Action, the petitioners gave the information about Novartis's competitors to the news media, not to Novartis as required by the Rule. *See id.* § 240.21F-4(c)(3).

The petitioners then challenged the CRS's preliminary determination. They argued that the CRS incorrectly concluded that the three fact patterns described in Rule 21F-4(c) were the exclusive routes to satisfy the Rule and that it should have considered "alternative circumstances not specified in" the Rule in analyzing their claims. Notably, they did not contest the CRS's determination that their circumstances failed to meet the requirements of any of the three fact patterns set forth in Rule 21F-4(c).

Taking up the petitioners' challenge, the SEC first noted that they "appear to concede that they have not satisfied the three fact patterns set forth in Rule 21F-4(c)." J.A. 293. It then rejected the argument that there are "alternative circumstances not specified in Rule 21F-4(c) in which a claimant can satisfy" the Rule's "led to" requirement. The Commission reiterated that it had rejected this argument in a previous order and that it had interpreted the Rule's three fact patterns as exclusive since the Rule's adoption. *See In the Matter of the Claim for Award in Connection with Redacted*, Rel. No. 89551, 2020 WL 4720539, at *4 (Aug. 13, 2020) (citing 76 Fed. Reg. 34300, 34357 (June 13, 2011)). It added that expanding the Rule beyond the three prescribed fact patterns would introduce unnecessary speculation and complexity into the analysis and

make the Rule too difficult and impracticable to administer. Accordingly, the petitioners' award applications were denied.

## II.

We have jurisdiction of the petitions under 15 U.S.C. § 78u-6(f) and 17 C.F.R. § 240.21F-13 ("A determination of whether or to whom to make an award may be appealed within 30 days after the Commission issues its final decision to the United States Court of Appeals for the District of Columbia Circuit."). Whistleblower award determinations "shall be in the discretion of the Commission," 15 U.S.C. § 78u-6(f), and may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). Courts defer to an agency's interpretation of its own regulation if the regulation in question is "genuinely ambiguous" and if the agency's reading is reasonable. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–16 (2019). The interpretation must be the agency's "authoritative" or "official position," "implicate its substantive expertise" and reflect "fair and considered judgment" to receive deference. *Id.* at 2416–18 (citations omitted); *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 983 F.3d 498, 507 (D.C. Cir. 2020) (quoting *id.*).

## III.

### A.

Under the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (codified at 12 U.S.C. §§ 5301 *et seq.*), the Congress created a whistleblower award program that provides monetary incentives to individuals with knowledge of securities violations to assist the government in identifying and prosecuting the violations. The Act authorizes the SEC to give monetary awards to "whistleblowers who voluntarily provided

original information to the Commission that *led to* the successful enforcement of the covered judicial or administrative action" and that "results in monetary sanctions exceeding $1,000,000." 15 U.S.C. § 78u-6(a)(1), (b)(1) (emphasis added). The Congress further granted the SEC "authority to issue such rules and regulations as may be necessary to implement" the whistleblower program and discretion to determine "whether, to whom, or in what amount to make awards." *Id.* § 78u-6(f), (j).

Following Dodd-Frank's enactment and a notice-and-comment period, the SEC accordingly adopted final rules to implement the whistleblower program. Securities Whistleblower Incentives and Protections, 76 Fed. Reg. 34,300 (June 13, 2011) (Adopting Release). The promulgated rules—in particular, Rule 21F-4(c)—set forth the circumstances under which information provided by whistleblowers will be considered to have "led to" the successful enforcement of a covered action, as the statute requires for award eligibility. *See* 15 U.S.C. § 78u-6(b)(1) ("In any covered judicial or administrative action, or related action, the Commission under regulations prescribed by the Commission . . . shall pay an award or awards to 1 or more whistleblowers who voluntarily provided original information to the Commission that led to the successful enforcement of the covered judicial or administrative action, or related action."); 17 C.F.R. § 240.21F-4(c) (defining "[i]nformation that leads to successful enforcement").

Rule 21F-4(c) identifies "any of the following circumstances" as scenarios in which whistleblower information will be deemed to have "led to" a successful enforcement action: (1) the whistleblower's "original information" caused the SEC "to commence an examination, open an investigation, [or] reopen an investigation" and the

successful action was "based in whole or in part" on that information; (2) the "original information" involves "conduct that was already under examination or investigation by" the SEC or other federal or state agencies and the information "significantly contributed to the success of the action"; and (3) the "original information" was reported "through an entity's internal whistleblower . . . procedures," the entity either gave the information to the SEC or "provided results of an audit or investigation initiated in whole or in part in response" to this information and the information the entity submitted to the SEC satisfies either of the other two scenarios. 17 C.F.R. 240.21F-4(c)(1)–(3).[2] In the preamble to Rule 21F-

---

[2] 17 C.F.R. § 240.21F-4(c) in its entirety provides:

(c) Information that leads to successful enforcement. The Commission will consider that you provided original information that led to the successful enforcement of a judicial or administrative action in any of the following circumstances:

(1) You gave the Commission original information that was sufficiently specific, credible, and timely to cause the staff to commence an examination, open an investigation, reopen an investigation that the Commission had closed, or to inquire concerning different conduct as part of a current examination or investigation, and the Commission brought a successful judicial or administrative action based in whole or in part on conduct that was the subject of your original information; or

(2) You gave the Commission original information about conduct that was already under examination or investigation by the Commission, the Congress, any other authority of the federal

4(c), the SEC noted that "a whistleblower is *only* entitled to an award if one of [the] three general standards is satisfied." Adopting Release, 76 Fed. Reg. at 34,357 n.438 (emphasis added).

**B.**

The question before us is whether Rule 21F-4(c)'s three fact patterns under which a whistleblower's information "led to" a successful enforcement action are exhaustive, as the Commission interpreted the regulation in its denial of the petitioners' award applications. We conclude that the

government, a state Attorney General or securities regulatory authority, any self-regulatory organization, or the PCAOB (except in cases where you were an original source of this information as defined in paragraph (b)(5) of this section), and your submission significantly contributed to the success of the action.

(3) You reported original information through an entity's internal whistleblower, legal, or compliance procedures for reporting allegations of possible violations of law before or at the same time you reported them to the Commission; the entity later provided your information to the Commission, or provided results of an audit or investigation initiated in whole or in part in response to information you reported to the entity; and the information the entity provided to the Commission satisfies either paragraph (c)(1) or (c)(2) of this section. Under this paragraph (c)(3), you must also submit the same information to the Commission in accordance with the procedures set forth in § 240.21F–9 within 120 days of providing it to the entity.

regulation is ambiguous and defer to the Commission's interpretation in accordance with the United States Supreme Court's holding in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).

An agency merits deference if it reasonably interprets its own "genuinely ambiguous" regulation. *Nat'l Lifeline Ass'n*, 983 F.3d at 507 (quoting *Kisor*, 139 S. Ct. at 2414). Genuine ambiguity can arise, as the Supreme Court explained, in a variety of circumstances, as when a regulation "may prove susceptible to more than one reasonable reading." *Kisor*, 139 S. Ct. at 2410.

"Ambiguity, however, is necessary but not sufficient for us to afford deference. The court must also ask 'whether the character and context of the agency interpretation entitles it to controlling weight.'" *Nat'l Lifeline Ass'n*, 983 F.3d at 507 (quoting *Kisor*, 139 S. Ct. at 2416). The Supreme Court provided three guiding principles for courts to apply in determining whether an agency's interpretation of its own genuinely ambiguous regulation warrants deference. First, the interpretation "must be one actually made by the agency." *Kisor*, 139 S. Ct. at 2416. In other words, "it must be the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views." *Id.* (citation omitted). Second, "the agency's interpretation must in some way implicate its substantive expertise." *Id.* at 2417. And third, "an agency's reading of a rule must reflect 'fair and considered judgment' to receive . . . deference." *Id.* (citation omitted).

We first consider whether Rule 21F-4(c) is genuinely ambiguous. Both the petitioners and the SEC contend that the regulation is unambiguous—in the petitioners' view, the regulation unambiguously allows for scenarios other than the three enumerated in the Rule to satisfy the "led to" standard;

according to the SEC, however, the list of three fact patterns is unambiguously exhaustive. We disagree and find Rule 21F-4(c) ambiguous.

Rule 21F-4(c) does indeed "prove susceptible to more than one reasonable reading." *Kisor*, 139 S. Ct. at 2410. In the petitioners' favor is the fact that the regulation's prefatory language, which states that whistleblowers will satisfy the "led to" standard "in any of the following circumstances," does not expressly limit the standard to the three enumerated fact patterns, as the SEC has acknowledged in the past. 17 C.F.R. § 240.21F-4(c); *see In the Matter of the Claim for Award in Connection with Redacted*, Rel. No. 89551, 2020 WL 4720539, at *4 (recognizing that "Rule 21F-4(c) does not expressly state that the three components are the only way to establish 'led to'"). For example, absent from the prefatory text is any restricting or limiting language, including the word "only." *See* 17 C.F.R. § 240.21F-4(c). Its absence is noteworthy given that the Commission used "only" in its Adopting Release to explain that the three fact patterns are exclusive. Adopting Release, 76 Fed. Reg. at 34,357 n.438 ("a whistleblower is *only* entitled to an award if one of [the] three general standards is satisfied") (emphasis added).

On the other hand, there is no clear textual signal that fact patterns other than the three explicitly enumerated provide alternatives for a whistleblower to establish that the "led to" standard has been met. Notably missing from the regulations are words or phrases indicating that the three listed fact patterns are merely illustrative—for example, "among others," "including," "not limited to" or "such as." Nor did the

Commission reserve to itself any residual or catch-all authority to issue awards in other circumstances.

And, finally, a word about *expressio unius est exclusio alterius*, the maxim upon which the petitioners rely. Petitioners' Reply Br. 6. As courts and commentators have noted, this canon (if it can be called a canon) is entirely dependent upon context. *See Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002) ("*expression unius* properly applies only when in the natural association of ideas in the mind of the reader that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference."); Reed Dickerson, *The Interpretation and Application of Statutes* 234–35 (1975). When context indicates a list is meant to be exclusive, the "canon" applies; when context does not so indicate, the "canon" does not apply. There is thus much truth to the observation that "this maxim is at best a description, after the fact, of what the court has discovered from context." Dickerson, *supra*, at 235. Here, there are no clues pointing one way or the other. The level of detail in the three fact patterns could plausibly be interpreted as the manifestation of an intent to be exhaustive but it could just as plausibly be interpreted as merely setting forth a template for the required degree of causality one must establish to satisfy the "led to" standard. Unfortunately, even after applying the "'traditional tools' of construction," *Kisor*, 139 S. Ct. at 2415, this regulation remains "impenetrable." *Id.* Rule 21F-4(c), then, can be read in more than one way—limiting the "led to" standard to the three enumerated fact patterns and/or allowing the SEC to consider others.

Because we find the regulation genuinely ambiguous, we next consider whether the Commission's interpretation warrants deference. Although our inquiry cannot be "reduce[d] to any exhaustive test," we follow the guideposts set forth by

the Supreme Court in *Kisor* and conclude that it does. 139 S. Ct. at 2416.

First, the SEC's interpretation reflects its "authoritative" and "official position." *See id.* (citation omitted). The petitioners do not dispute this, nor can they because the Commission's reading "emanate[s] from those actors . . . understood to make authoritative policy," was pronounced in the SEC's Adopting Release and has been reaffirmed in public adjudicative orders. *Nat'l Lifeline Ass'n*, 983 F.3d at 511 (citation omitted) (analyzing *Kisor*'s first interpretive guidepost); *see* Adopting Release, 76 Fed. Reg. at 34,357 n.438 ("[A] whistleblower is only entitled to an award if one of [the] three general standards is satisfied."); *In the Matter of the Claim for Award in Connection with Redacted*, Rel. No. 89551, 2020 WL 4720539, at *4 ("If . . . a claimant does not fall within any of the three circumstances identified in the rule, then he or she is not entitled to an award."); *In the Matter of the Claim for Award in Connection with Redacted*, Rel. No. 82897, 2018 WL 1378788, at *4 (Mar. 19, 2018) (declining to "adopt a more flexible or lax standard" for the "led to" requirement).

Second, the interpretation "implicate[s] [the Commission's] substantive expertise" in implementing the whistleblower program. *Kisor*, 139 S. Ct. at 2417. Granted, the "basis for deference ebbs" under this factor "when '[t]he subject matter [in dispute] is distan[t] from the agency's ordinary' duties or 'fall[s] within the scope of another agency's authority.'" *Id.* (alterations in original) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 309 (2013) (Breyer, J., concurring in part and concurring in judgment)). But the subject matter in dispute here—the Commission's process for determining whistleblower award eligibility—is part and parcel of the SEC's statutorily assigned duties. Indeed, "Congress has explicitly entrusted the Commission with

implementation and oversight of the program." *Nat'l Lifeline Ass'n*, 983 F.3d at 511; *see* 15 U.S.C. § 78u-6(j) (granting SEC "authority to issue such rules and regulations as may be necessary and appropriate to implement the provisions" establishing whistleblower award program). And no other agency is involved in whistleblower award determinations. Furthermore, the whistleblower program "is laden with carefully considered implicit and explicit policy judgments on the part of the Commission," including balancing the burden of administering the whistleblower regime while providing an adequate incentive for potential whistleblowers to come forward. *Nat'l Lifeline Ass'n*, 983 F.3d at 511; *see In the Matter of the Claim for Award in Connection with Redacted*, Rel. No. 89551, 2020 WL 4720539, at *4 (discussing SEC's decade of experience administering program and policy considerations at play in developing it).

The petitioners protest that determining a whistleblower's eligibility for an award is not "rocket science" and therefore cannot lie within the Commission's substantive expertise. Agencies can and frequently do, as the SEC does here, possess expertise in fields of varying complexity, including in those less convoluted than "rocket science." The SEC's interpretation of its whistleblower award program regulations undoubtedly implicates its "policy expertise." *Kisor*, 139 S. Ct. at 2417.

Third and finally, the SEC's reading "reflect[s] [its] 'fair and considered judgment.'" *Id.* The Commission has consistently justified its interpretation "from both a policy and an interpretive standpoint." *Nat'l Lifeline*, 983 F.3d at 512; *see In the Matter of the Claim for Award in Connection with Redacted*, Rel. No. 89551, 2020 WL 4720539, at *4 (more lax "led to" standard "would risk introducing speculative and complex causal chains that would be difficult and

impracticable . . . to investigate and evaluate," while limiting to three circumstances "sends a clear signal to all potential whistleblowers of what is expected of them"); *In the Matter of the Claim for Award in Connection with Redacted*, Rel. No. 82897, 2018 WL 1378788, at \*4 (standard "was considered and commented on at length during the adoption of the whistleblower rules" and "was carefully tailored . . . to provide a uniform standard that would apply to all claimants"). And there is no indication that the Commission's interpretation is merely a "convenient litigating position or *post hoc* rationalizatio[n] advanced to defend past agency action against attack." *Kisor*, 139 S. Ct. at 2417 (alteration in original) (internal quotation marks and citation omitted); *see In the Matter of the Claim for Award in Connection with Redacted*, Rel. No. 89551, 2020 WL 4720539, at \*4 ("[I]t has been the Commission's consistent practice for almost a decade now to apply the rule in this manner."). Thus, the SEC's interpretation is a product of its fair and considered judgment.

In sum, given that the text of Rule 21F-4(c) is genuinely ambiguous, the SEC's interpretation is entitled to deference pursuant to the interpretive guideposts announced by the Supreme Court in *Kisor*. Accordingly, the petitioners' claim that the Commission's reading does not fall within the bounds of reasonable interpretation fails.

## C.

Before this court, the petitioners now assert that the Commission erred in denying their award applications because they have satisfied the "led to" standard's second fact pattern under Rule 21F-4(c)(2). This argument is forfeit because they did not raise it before the SEC and offer no reasonable explanation for failing to do so. *See* 15 U.S.C. § 78y(c)(1) ("No objection to an order or rule of the Commission, for which

review is sought under this section, may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so."); *Springsteen-Abbott v. SEC*, 989 F.3d 4, 7 (D.C. Cir. 2021) ("Congress has prohibited us from considering issues not raised before the SEC.").

The petitioners maintain that they preserved this argument in their challenges to the CRS's preliminary determination by asserting in footnotes that they "incorporate[] . . . all information and arguments" made in their award applications and "do[] not waive any argument or position." J.A. 273 n.21, 282 n.20. But they fail to provide any citation to the portion of their original award applications where they made this argument. Indeed, an examination of their memoranda in support of their application reveals that they did not explain how they have satisfied the second—or any—of the three fact patterns in Rule 21F-4(c). They merely assert that they "clearly satisf[y] Congress' 'led to' standard." J.A. 20, 102 (emphasis omitted). For this reason, the SEC never addressed this argument in its review of the petitioners' challenge to the CRS's preliminary determination—the petitioners' counsel's protestations to the contrary at oral argument notwithstanding. *See* J.A. 293 (petitioners "appear to concede that they have not satisfied the three fact patterns set forth in Rule 21F-4(c)").

Merely disclaiming the "waive[r] [of] any argument or position" does not preserve an argument that was never made before the Commission. *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."). If a generic disclaimer sufficed for preservation, litigants would never risk forfeiting or waiving an argument and could raise arguments on appeal that neither a district court nor an administrative agency had an opportunity to consider nor the opposing party the chance to

rebut. "As an appellate court, 'we are a court of review, not of first view." *Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 789 (D.C. Cir. 2019) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)).[3]

For the foregoing reasons, the petitions for review are denied.

*So ordered.*

---

[3] The petitioners' remaining argument that Rule 21F-4(c) is inconsistent with the Congress's intent as expressed in the Dodd–Frank Act and therefore does not warrant deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), is meritless.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring in the judgment: I agree with my colleagues' conclusion that the Securities and Exchange Commission's (SEC or Commission) interpretation of Exchange Act Rule 21F-4(c), 17 C.F.R. § 240.21F-4(c), is reasonable and warrants deference *if* the text of the regulation is ambiguous. *See* Per Curiam Op. at 15. I write separately because, to me, the text of Rule 21F-4(c) unambiguously limits whistleblower award eligibility to the three enumerated fact patterns and the deference analysis under *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), is unnecessary.

"[B]efore concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction." *Id.* at 2415 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)). "That means a court cannot waive the ambiguity flag just because it found the regulation impenetrable on first read." *Id.*; *see also* Raymond M. Kethledge, *Ambiguities and Agency Cases: Reflections After (Almost) Ten Years on the Bench*, 70 VAND. L. REV. EN BANC 315, 319 (2017) ("It matters very much . . . that judges work very hard to identify the objective meaning of the text before giving up and declaring it ambiguous."). With a little extra effort, I am left with no doubt that Rule 21F-4(c) is unambiguous.

To begin, I again agree with my colleagues that Rule 21F-4(c) contains no "clear textual signal that fact patterns other than the three explicitly enumerated provide alternatives for a whistleblower to establish that the 'led to' standard has been met." Per Curiam Op. at 11. They rightly highlight the absence of any language indicating that the three fact patterns are merely illustrative, as well as any reservation of residual or catch-all authority for the SEC to consider other scenarios in determining award eligibility. *Id.* at 11–12. So far, so good.

In my view, however, they place too much significance on the omission of the word "only" from the Rule's prefatory text.

*Id.* at 11; *see* 17 C.F.R. § 240.21F-4(c) (before enumerating the three fact patterns, the Rule states that the "Commission will consider that [a claimant] provided original information that led to the successful enforcement of a judicial or administrative action *in any of the following circumstances*") (emphasis added). Without this word, they conclude, we must speculate whether the SEC intended the list of three fact patterns to be exhaustive—especially given that the Commission saw fit to use "only" in the release document announcing the regulation. Per Curiam Op. at 11 (citing Securities Whistleblower Incentives and Protections, 76 Fed. Reg. 34,300, 34,357 n.438 (June 13, 2011) ("a whistleblower is only entitled to an award if one of [the] three general standards is satisfied")).

But there is more than one way to skin a cat and, with a language as versatile as ours, "only" is not the sole way to connote exclusivity. The Rule makes clear that the "led to" standard is met in "any of the following circumstances," giving no hint that it might consider other (undefined) circumstances. 17 C.F.R. § 240.21F-4(c). It then lists three—and only three— sets of circumstances that lead to award eligibility. *Id.* § 240.21F-4(c)(1)–(3). I believe nothing more is required.[1] As we have stated, "[t]here is no need for [the court] to rely on what the [regulation] did *not* say to infer [its meaning] because [its meaning] is made clear through its plain language." *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1069 (D.C. Cir. 2018) (emphasis in original).

---

[1] In a previous order, the Commission stated that "Rule 21F-4(c) does not expressly state that the three components are the only way to establish 'led to.'" *In the Matter of the Claim for Award in Connection with Redacted*, Rel. No. 89551, 2020 WL 4720539, at *4 (Aug. 13, 2020). I read this merely to acknowledge the plain fact that the Rule does not use the word "only." As I explain, however, the Commission did not need to.

There's more. Also applicable here is the interpretive canon *expressio unius est exclusio alterius*,[2] which means "expressing one item of [an] associated group or series excludes another left unmentioned." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002) (alteration in original) (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)). Applied to Rule 21F-4(c), the canon means that the Commission expressly enumerated three fact patterns that result in award eligibility and thereby excluded from consideration others left unmentioned.

Granted, we have cautioned that the *expressio unius* canon is a "feeble helper in an administrative setting," *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 697 (D.C. Cir. 2014) (quoting *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990)), and that it "applies only when 'circumstances support[] a sensible inference that the term left out must have been meant to be excluded,'" *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (quoting *Echazabal*, 536 U.S. at 81). Those circumstances exist here. The text alone provides more than enough to sensibly infer that the list is exhaustive because a close examination reveals that the Commission crafted detailed, specific, multidimensional and exceedingly flexible fact patterns that can be satisfied in multiple ways. *See, e.g.*, 17 C.F.R. § 240.21F-4(c)(1) (causing SEC to "commence an examination," "open" or "reopen an investigation" or "inquire concerning different conduct as part of a current examination or investigation"); *id.* § 240.21F-4(c)(2) (providing original information about conduct already under investigation by other federal or state agencies, including "the Commission, the Congress, any other authority of the federal government, a state

---

[2] My colleagues' minimization to the contrary notwithstanding, Per Curiam Op. at 12, our circuit has often used the *expressio unius* canon qua canon. *See, e.g.*, *Taylor v. FAA*, 895 F.3d 56, 65 (D.C. Cir. 2018) (applying *expressio unius* "canon").

Attorney General or securities regulatory authority, any self-regulatory organization, or [under some conditions] the [Public Company Accounting Oversight Board]"); *id.* § 240.21F-4(c)(3) (reporting information through "entity's internal whistleblower, legal, or compliance procedures . . . before or at the same time [the claimant] reported them to the Commission" and entity's subsequent audit or investigation is "initiated in whole or in part in response to" this information). On my reading, the Commission's detailed and refined fact patterns plainly evince the intent to limit the circumstances to which it will extend award eligibility to those expressly enumerated in Rule 21F-4(c) rather than a willingness to entertain other yet-to-be-defined scenarios on an *ad hoc* basis. Because the text of Rule 21F-4(c) unambiguously restricts whistleblower award eligibility to the three fact patterns provided, no additional analysis is necessary.[3]

---

[3] At oral argument, the petitioners' counsel attempted to support their reading by comparing the Rule listing three fact patterns to a restaurant's menu offering "any of the following" three items—spaghetti marinara, Bolognese or carbonara—and suggesting that "a patron could naturally order buttered spaghetti." Oral Argument at 4:45–5:20. Perhaps. But this analogy provides little, if any, help because a diner might make this leap based on a restaurant's custom or practice but not based on the *text* of the menu. And that's what we are dealing with here—the text. Nothing in the text of the hypothetical menu indicates that diners are free to order items not included on the menu. Indeed, nothing in the text of the small-town Alabama diner's menu listing "breakfast," "lunch" and "dinner" gave Vinny Gambini and Mona Lisa Vito, two big-city New Yorkers, a choice other than—as the text stated—"breakfast," "lunch" and "dinner." MY COUSIN VINNY (20th Century Fox 1992).